UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MICHAEL JAMISON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:16-CV-0441-B |
| | § | |
| FLUOR FEDERAL SOLUTIONS, | § | |
| LLC, a South Carolina Limited Liability | § | |
| Company, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION & ORDER

Before the Court is Defendant Fluor Federal Solutions, LLC's Motion to Dismiss Plaintiff Michael Jamison's First Amended Complaint. Doc. 24. For the following reasons, the Court **GRANTS** Defendant's Motion.

## I.

## BACKGROUND[1]

This is an employment dispute. Plaintiff was employed as a Safety, Security, and Transportation Manager by Defendant's predecessor-in-interest, Del-Jen, Inc. Doc. 22, Pl.'s Am. Compl. ¶¶ 6, 15. He now maintains that Defendant, a Job Corps[2] contractor, fired him in retaliation for his participation in a November 2013 *qui tam* action. Doc. 22, Pl.'s Am. Compl. ¶¶ 7–11, 27–32.

---

[1] The Court draws its factual account from the initial pleadings as well as the parties' briefing on the Motion at issue. Any contested fact is identified as the allegation of a particular party.

[2] According to the parties, Job Corps is a federal program that provides educational and career technical skills, training, and support services through a nationwide network of campuses offering career development services to at-risk young men and women ages 16 through 24. Doc. 22, Pl.'s Am. Compl. ¶ 8.

A.     *Job Corps's Operations*

By way of background—and undisputed by the parties[3]—the United States Department of Labor (DOL) contracts with private companies to run Job Corps centers. *Id.* ¶ 9. The Job Corps center in this case is the North Texas Job Corps Center (NTJCC) in McKinney, Texas. *Id.* The private companies contracting with the DOL to run the NTJCC are Defendant (along with its predecessor-in-interest, Del-Jen, Inc.) and Career Opportunities, Inc. (COI). *Id.* ¶¶ 6, 9. As Defendant explains, the DOL contracted with COI to operate the NTJCC, and COI in turn subcontracted with Del-Jen, Inc.—and later Defendant—to provide certain personnel and services at the NTJCC. Doc. 24, Def.'s Mot. to Dismiss 2, 2 n.1; *see also* Doc. 22, Pl.'s Ex. 2. As further background: The DOL agreements with contractors at each center are performance-based and measured against other centers in areas such as: (1) total number of students enrolled at the center; (2) evaluations of students' achievement of academic and vocational credentials; (3) initial job placements; and (4) ongoing job placements following the initial placement. Doc. 22, Pl.'s Am. Compl. ¶¶ 9–10; Doc. 24, Def.'s Mot. to Dismiss 2. Favorable performance, Plaintiff says, results in incentive fees, bonuses, and contract extensions for the companies. Doc. 22, Pl.'s Am. Compl. ¶ 9.

Here, Plaintiff maintains that in operating the centers, companies such as Defendant and COI must follow the requirements of 29 U.S.C. §§ 2881, *et seq.*; 20 C.F.R. Parts 638 and 670; the DOL Job Corps Office "Policy and Requirements Handbook" (PRH); and guidelines and procedures established by the Secretary of Labor (collectively, the Guidelines). Doc. 22, Pl.'s Am. Compl. ¶ 9; *see also* Doc. 24, Def.'s Mot. to Dismiss 3. The Guidelines specifically mandate that students have

---

[3]*See* Doc. 24, Def.'s Mot. to Dismiss 1–3.

the following Job Corps qualifications: (1) legal residency status; (2) emotional stability without objective behavioral problems; (3) no criminal record; (4) no use of illegal drugs; and (5) no face-to-face court or institutional supervision or court-imposed fines while enrolled in Job Corps. Doc. 22, Pl.'s Am. Compl. ¶ 12; Doc. 24, Def.'s Mot. to Dismiss 3. According to the parties, the Guidelines also require program centers such as NTJCC to enforce a zero tolerance policy for students using drugs and other controlled substances, committing any act of violence against another student (such as assault, rape, or other bodily harm), or engaging in inappropriate sexual behavior. Doc. 22, Pl.'s Am. Compl. ¶ 12; Doc. 24, Def.'s Mot. to Dismiss 3.

B.    *Plaintiff's Allegations*

Plaintiff asserts that on November 15, 2010, Del-Jen, Inc. entered into a Concurrent Jurisdiction Agreement in which it agreed to notify the McKinney Police Department of any offenses committed on NTJCC property. Doc. 22, Pl.'s Am. Compl. ¶ 13. The NTJCC Director, Omoniyi Amoran, agreed to a substantially similar agreement on August 30, 2013. *Id.* ¶ 14; Doc. 24, Def.'s Mot. to Dismiss 3.

Plaintiff was hired by Del-Jen, Inc. in August 2012 as the Safety, Security, and Transportation Manager for NTJCC. Doc. 22, Pl.'s Am. Compl. ¶ 15; Doc. 24, Def.'s Mot. to Dismiss 1. In that capacity, Plaintiff says, his job was to follow the Guidelines and ensure student safety from any type of violence or drug abuse. Doc. 22, Pl.'s Am. Compl. ¶ 15.

Plaintiff claims that about a week after he started, he used a key given to him by Maria Martin, his immediate supervisor and an employee of COI, to open a door in the security department. *Id.* ¶ 17. Inside, Plaintiff avers, he observed various types of drugs and contraband explicitly mentioned in the Guideline's zero tolerance policy. *Id.* Plaintiff says that he was informed

by Martin and Jeffrey Joseph, the lead security day supervisor, that the items in the room had been taken from students without any disciplinary action or consequences. *Id.* Plaintiff claims that he was also informed that NTJCC had its own amnesty policy. *Id.* ¶ 20. Under the policy, says Plaintiff, students returning from off-campus could voluntarily turn over any contraband without being reported, disciplined, or having the police called. *Id.* In addition, Plaintiff maintains, NTJCC had a box located outside the security office used by students to voluntarily deposit contraband without consequence. *Id.* ¶ 21.

Plaintiff alleges that over the course of his first two months at NTJCC, he observed 3–10 incidents per day ranging from physical violence to drug use. *Id.* ¶ 22. Plaintiff, in turn, reported the incidents to the McKinney Police Department. *Id.* From August 2012 to December 2012, Plaintiff or his staff contacted the Police about 50 times. *Id.* But at some point between September and October of 2012, Martin told him to stop calling the police. *Id.* Plaintiff claims that other employees informed him that, although he was doing a good job, he would be fired because "each student was worth $50,000–$60,000 from the DOL" as long as they stayed in the program. *Id.* About four months later, according to Plaintiff, Martin instructed other security staff not to contact Plaintiff when incidents arose and moved all investigation responsibilities to the Equal Employment Opportunity Commission (EEOC). *Id.* ¶¶ 23–24. Plaintiff also alleges that Martin and Amoran told him on several occasions that he would be fired if he called the police again. *Id.* ¶ 25.

In November 2013, Plaintiff was one of four relators in a *qui tam* action filed in the Northern District of Texas. *Id.* ¶ 27. After filing the *qui tam* suit, Plaintiff met with the United States Attorney's Office and the DOL Office of Inspector General. *Id.* ¶ 28.

In early December 2013, an employee notified Plaintiff that Martin was telling employees not

to give any information to Plaintiff. *Id.* ¶ 29. Around the same time, Plaintiff was relieved of his duties, stripped of his investigative powers, and barred completely from any management meetings. *Id.* Plaintiff maintains that according to the employee, "there was every indication that the *qui tam* filing and the information from the meeting with the U.S. Attorney's Office had been leaked to Defendant and the management at NTJCC." *Id.*

In January 2014, Plaintiff submitted a written complaint to NTJCC's human resources department (the Internal Report) that detailed Plaintiff's complaints. *Id.* ¶ 30. In the written complaint, he discusses the instructions to not contact the police, his treatment, and Martin's control over student investigations, saying Martin "strategically manipulate[s] the investigation process of [student incidents]" and "[uses] program longevity as the primary determining factor for discipline." Doc. 22, Pl.'s Am. Compl. Ex. 2, Internal Report 2. Plaintiff alleges that he was then told by another employee that he would be fired if he complained to the DOL. Doc. 22, Pl.'s Am. Compl. ¶ 30. Plaintiff was suspended in May 2014 and fired on June 20, 2014. *Id.* ¶¶ 31–32; Doc. 22, Pl.'s Ex. 3, Notice of Termination. Based on that timeline, Plaintiff believes that he was fired in retaliation for trying to shed light on Defendant's activities by filing the *qui tam* suit and Internal Report. *See* Doc. 22, Pl.'s Am. Compl. ¶¶ 29–36.

C.    *Procedural History*

Plaintiff filed the present suit in February 2016, asserting a retaliatory discharge claim under the False Claims Act (FCA), 31 U.S.C. § 3730(h). *See* Doc. 1, Pl.'s Compl. After some initial confusion as to which entity ought to be the named defendant, Plaintiff amended his pleadings to include the correct parties. Doc. 22, Pl.'s Am. Compl.

Defendant then moved to dismiss Plaintiff's Amended Complaint under Federal Rules of

Civil Procedure 9(b)[4] and 12(b)(6) for failure to state a plausible claim for relief. Doc. 24, Def.'s Mot. to Dismiss. Plaintiff responded. Doc 28, Pl.'s Resp. to Def.'s Mot. to Dismiss [hereinafter, Pl.'s Resp.]. And Defendant replied. Doc. 29, Def.'s Reply to Pl.'s Resp. [hereinafter Def.'s Reply]. The Motion is thus ripe for the Court's review.

## II.

## LEGAL STANDARDS

A.    *Rule 12(b)(6)*

Rule 12(b)(6) authorizes the court to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)(quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). The court will "not look beyond the face of the pleadings to determine whether relief should be granted based on the alleged facts." *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability

---

[4]As addressed below, the Court concludes that Rule 9(b)'s heightened pleading standard does not apply to Plaintiff's claim. *See infra* pp. 7–8.

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* When well-pleaded facts fail to achieve this plausibility standard, "the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal quotation marks and alterations omitted).

B.    *Heightened Standard of Review*

Defendant argues that the Court should use Federal Rule of Civil Procedure 9(b)'s heightened pleading standard because the FCA is an anti-fraud statute. Doc. 24, Def.'s Mot. to Dismiss 9. Rule 9(b) states that when "alleging fraud or mistake, a party must state with *particularity* the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). Plaintiff argues the Court should instead apply the ordinary pleading standard under Rule 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); Doc. 28, Pl.'s Resp. 11.

The Fifth Circuit has not addressed the issue specifically. But most courts that have, including fellow district courts in the Fifth Circuit, have held that FCA retaliatory discharge claims under 31 U.S.C. § 3730(h) "'need only meet the Rule 8(a) standard.'" *Guerrero v. Total Renal Care, Inc.*, No. EP-11-cv-449-KC, 2012 WL 899228, at *3 (W.D. Tex. Mar. 12, 2012) (quoting *Thomas v. ITT Educ. Servs., Inc.*, No. 11-544, 2011 WL 3490081, at *3 (E.D. La. Aug. 10, 2011)).[5]

_____

[5]*See also United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010) (internal quotation marks and citations omitted) ("Because her retaliation claim did not depend on allegations of fraud, Sanchez's complaint only needed a short and plain statement of the claim showing that [she was] entitled to relief."); *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008) (quoting *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 238 n.23 (1st Cir. 2004)) ("[U]nlike a FCA violation claim, a FCA retaliation claim 'does not require a showing of fraud and therefore need not meet the heightened pleading requirements of Rule 9(b).'"); *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 729 (10th Cir. 2006); *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1259–60 (D.C. Cir. 2004).

The Court agrees with that reasoning.[6] A retaliatory discharge claim under 31 U.S.C. § 3730(h) does not rely on a showing of fraud. *See Guerrero*, 2012 WL 899228, at *3 ("These courts of appeal reasoned that because retaliation claims under the FCA are not dependant on allegations of fraud, Rule 9(b)'s heightened standard should not be applied."). Thus, Rule 8(a)'s ordinary pleading standard, not Rule 9(b)'s heightened standard, applies. *See id.* (collecting cases); *see also McCrary v. Knox Cty.*, 200 F. Supp. 3d 782, 786 n.1 (S.D. Ind. 2016); *United States ex rel. Wood v. Allergan, Inc.*, — F. Supp. 3d —, 2017 WL 1233991, at *36 (S.D.N.Y. 2017); *United States v. N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 297 (E.D.N.Y. 2016).

C.    *Retaliatory Discharge Under the False Claims Act*

The purpose of the FCA is to combat fraud against the government. *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994); *see generally* 31 U.S.C. § 3729. With that

---

[6]Defendant relies on *Sealed Appellant I v. Sealed Appellee I*, 156 F. App'x 630, 632 (5th Cir. 2005) to show that courts have applied Rule 9(b) to FCA retaliation claims. In that case the Fifth Circuit affirmed a district court's dismissal of a plaintiff's *qui tam* suit alleging: (1) violations of the FCA for fraud; and (2) retaliatory discharge. *Id.* In analyzing the FCA fraud claim, the Fifth Circuit applied Rule 9(b). *Id.* at 633–34. But in addressing the retaliatory discharge claim, the Fifth Circuit affirmed the district court's dismissal on the grounds that the plaintiff failed to allege "that he was engaged in a protected activity" without specifying which pleading standard was in play. *See id.* at 634–35. The Court disagrees with Defendant's reading of *Sealed Appellant I*. If anything, the Fifth Circuit's deliberate mention of Rule 12(b)(6) for retaliation claims after addressing other FCA claims under Rule 9(b) suggests that different standards apply. In any event, the Court concludes that the Fifth Circuit has not specifically addressed which pleading standard applies to FCA retaliation claims.

Defendant also cites to two more cases for the same proposition. *See Haynes v. Breathing Ctr. of Hous.*, No. 4:15-cv-02569, 2016 WL 3418852, at *5 (S.D. Tex. June 21, 2016) (summarily rejecting defendant's Rule 9(b) motion to dismiss FCA retaliation claim after conducting thorough analysis of defendant's Rule 12(b)(6) motion to dismiss and then denying it) and *Roop v. Melton*, No. 3:12-cv-00116-GHD-SAA, 2013 WL 5349153, at *5 (N.D. Miss. Sept. 24, 2013) (denying defendant's motion to dismiss general fraud claims under the FCA pursuant to Rule 9(b) together with retaliation claim without specifying which standard applied to retaliation claim). But much like *Sealed Appellant I*, these cases never specify which pleading standard applies to FCA retaliation claims. Embracing Defendant's position would require an inferential leap that cuts against authority from other district courts in this Circuit, as well as that of other circuits around the country. The Court declines to do so.

in mind, its whistleblower provision "protects employees who take steps to uncover and report an employer's fraudulent submission of claims to the government." *Guerrero*, 2012 WL 899228, at *3. In particular, the statute states:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h).

## III.

## ANALYSIS

To adequately state an FCA retaliation claim, Plaintiff must demonstrate that: (1) he participated in a protected activity; (2) Defendant was aware that he engaged in the activity; and (3) he was discriminated against as a result of participation in the activity. *United States ex rel. George v. Bos. Sci. Corp.*, 864 F. Supp. 2d 597, 603–04 (S.D. Tex. 2012).

As a quick recap, Plaintiff alleges that Defendant retaliated against him in violation of the FCA by firing him for: (1) his role as a relator in a *qui tam* action; and (2) internally reporting what he perceived as violations of the Guidelines. Doc. 22, Pl.'s Am. Compl. ¶¶ 29–36. Defendant, by contrast, argues that Plaintiff's Amended Complaint should be dismissed because it fails to allege any facts demonstrating that Defendant was aware of Plaintiff's participation in a protected activity. Doc. 24, Def.'s Mot. to Dismiss 1, 10–17. Nonetheless, Plaintiff still bears the burden to plausibly allege all three elements. *See Twombly*, 550 U.S. at 570.

The Court considers the first two elements in turn. As discussed below, the Court concludes

- 9 -

that Plaintiff failed to adequately allege that Defendant was aware of his participation in a protected activity. For that reason, the Court does not reach the question of whether Plaintiff was discriminated against as a result of his actions.

A.    *Participation in a Protected Activity*

The scope of protected activities under the FCA was broadened in 2009 when Congress passed the Fraud Enforcement and Recovery Act. *See generally* Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4(d), 123 Stat. 1617, 1624–25. The breadth of activities protected by the statute now includes all "lawful acts done . . . in furtherance of an action under this section *or other efforts to stop 1 or more violations of this subchapter.*" 31 U.S.C. § 3730(h) (emphasis added).

Plaintiff alleges that he engaged in two protected activities: (1) serving as a relator in a *qui tam* action; and (2) internally reporting what he perceived as violations of the Guidelines. Doc. 22, Pl.'s Am. Compl. ¶¶ 29–36.[7] Defendant acquiesces that Plaintiff engaged in a protected activity by serving as a relator in a *qui tam* action but does not address whether Plaintiff's internal reporting also qualifies as a protected activity. Doc. 24, Def.'s Mot. to Dismiss 10–11.

The Court agrees with Defendant that filing a *qui tam* suit is a protected activity. *Robertson*, 32 F.3d at 951. As to Plaintiff's internal reporting, "[t]he Fifth Circuit recognizes internal complaints

---

[7]The Court notes that Plaintiff's First Amended Complaint expressly states: "Plaintiff's filing of the Qui Tam was protected activity under the statute." Doc. 22, Pl.'s Am. Compl. ¶ 34. There is no such express mention of Plaintiff's internal reporting as a protected activity. Nevertheless, Plaintiff does mention his Internal Report just one page earlier and allege that he was warned that further complaints would lead to his termination. *Id.* ¶ 30. And Plaintiff's briefing argues that both his internal reporting and role as relator in a *qui tam* action were protected activities. Doc. 28, Pl.'s Resp. 19–20. The Court therefore reads Plaintiff's Amended Complaint to allege two protected activities. As addressed below, however, the Court's liberal reading has no impact on its ultimate conclusion here: Plaintiff's Internal Report did not make Defendant aware of his engagement in a protected activity. *See infra* pp. 11–20. Therefore, it cannot plausibly give rise to an FCA claim for retaliatory discharge.

- 10 -

that 'concern false or fraudulent claims for payment to the government' as protected activity under the [FCA], but requires that the complaints raise concerns about fraud." *George*, 864 F. Supp. 2d at 605 (citing *United States ex rel. Patton v. Shaw Servs., L.L.C.*, 418 F. App'x 366, 372 (5th Cir. 2011)). As addressed more fully below, it's unclear whether Plaintiff's Internal Report rises to that level. But Defendant challenges Plaintiff's internal reporting at the second step of the analysis here, arguing that the complaint was insufficient to make Defendant aware that Plaintiff engaged in a protected activity. *See* Doc. 24, Def.'s Mot. to Dismiss 14–17. So the Court will address it at that step, too.

Accordingly, the Court: (1) concludes that Plaintiff engaged in a protected activity by serving as a relator in a *qui tam* action; and (2) assumes without deciding that Plaintiff engaged in a protected activity when he filed his Internal Report. The Court next considers whether Defendant was aware that Plaintiff engaged in a protected activity.

B.    *Awareness of Participation in Protected Activity*

"A successful [FCA] retaliation claim requires Defendant to have known Plaintiff engaged in a protected activity." *Guerrero*, 2012 WL 899228, at *7 (citing *Patton*, 418 F. App'x at 371–72; *Robertson*, 32 F.3d at 951). Thus, Plaintiff's First Amended Complaint must sufficiently plead that Defendant was on notice that Plaintiff had engaged in a protected activity. *See George*, 864 F. Supp. 2d at 607–08.

"'Notice can be accomplished by expressly stating an intention to bring a *qui tam* suit, but it may also be accomplished by any action which a factfinder reasonably could conclude would put the employer on notice that litigation is a reasonable possibility.'" *George*, 864 F. Supp. 2d at 608 (quoting *Williams*, 389 F.3d at 1262). Said differently, an employer may be put on notice indirectly. In that case, "[t]he employer need not know that the employee has filed or is contemplating such

an action. Rather, the employer must know that the employee was engaged in protected activity—that is, investigation or other activity concerning potentially false or fraudulent claims that reasonably could lead to a FCA investigation." *Id.* (internal citations and quotation marks omitted).

In moving to dismiss, Defendant maintains that Plaintiff's First Amended Complaint does not sufficiently plead that: (1) Defendant was aware of Plaintiff's involvement in the *qui tam* action; and (2) Plaintiff's Internal Report put Defendant on notice of possible *qui tam* litigation. Doc. 24, Def.'s Mot. to Dismiss 11–17. Plaintiff, placing emphasis on the temporal relationship between his actions and termination, responds that the facts alleged in his First Amended Complaint are sufficient to demonstrate that Defendant knew that he engaged in a protected activity. Doc. 28, Pl.'s Resp. 16–17, 21–23. The Court addresses Defendant's potential knowledge of each activity in turn.

1.    *Qui Tam* Action

Defendant argues that Plaintiff's First Amended Complaint is "devoid of any factual allegations that [it] had any knowledge of [Plaintiff's] *qui tam* suit." Doc. 24, Def.'s Mot. to Dismiss 11. The Court agrees to the extent that Plaintiff's First Amended Complaint does not include an express factual allegation that Defendant knew about the *qui tam* action. Indeed, just one allegation—identified by Defendant in its Motion—even suggests that Defendant might have been on notice of Plaintiff's involvement in the *qui tam. Id.* Defendant offers three arguments, which are addressed below, as to why that allegation in insufficient. *Id.* at 11–14.

Plaintiff does not respond to Defendant's arguments other than by generally noting the low bar needed to satisfy Rule 12(b)(6)'s plausibility standard. *See* Doc. 28, Pl.'s Resp. 21–23. Instead, he points to four other allegations in his First Amended Complaint as examples of "roadblocks" put in place by Defendant, supposedly because it knew that he was engaged in a protected activity:

- 12 -

(1) Martin instructed Plaintiff not to do his duties or report instances to the McKinney police; (2) Martin instructed security staff working under Plaintiff not to report violations to Plaintiff; (3) Martin threatened to fire Plaintiff for carrying out his duties; and (4) Martin stripped Plaintiff of his investigative authority and transferred it to the EEOC. Doc. 28, Pl.'s Resp. 21–23; *see also* Doc. 22, Pl.'s Am. Compl. ¶¶ 19–26.

Plaintiff seems to argue that the Court should infer that Defendant was aware of Plaintiff's involvement in the *qui tam* suit because those events allegedly took place. In effect then, Plaintiff points to allegations[8] in his First Amended Complaint to ask the Court a rhetorical question—Why would Defendant put these "roadblocks" in Plaintiff's way if it did not know that he filed the *qui tam* action? But there's a problem with that theory: Plaintiff filed his *qui tam* action in November 2013, which—based on the chronology of events as pled in Plaintiff's First Amended Complaint—was *after* those instances took place. *See* Doc. 22, Pl.'s Am. Compl. ¶ 27. So as a temporal matter, the allegations Plaintiff identifies as "roadblocks" do not plausibly demonstrate that Defendant was on notice of the *qui tam* action.[9] Thus, Plaintiff's proffered response falls flat.

Turning back to arguments presented by the Motion at hand, however, Defendant does identify an allegation that could suggest that Defendant was on notice of the *qui tam* action:

> 29.    In early December 2013, Plaintiff was told by an employee, Mr. Klinger, that Martin was telling employees not to give any information to Plaintiff and that there was every indication that the Qui Tam filing and the information from the meeting with the US

---

[8]But notably, not the allegation attacked by Defendant's Motion.

[9]To the extent Plaintiff argues that the "roadblocks" were the result of his internal reporting, the Court is similarly unpersuaded. As addressed below, Plaintiff's internal reporting did not put Defendant on notice that he engaged in a protected activity. But more importantly here, the report was filed after the *qui tam* action. Doc 22, Pl.'s Am. Compl. ¶ 30. Thus, the same temporal restrictions apply.

> Attorney had been leaked out to the Defendant and the management at NTJCC. Around the same time, Plaintiff was relieved of his duties, stripped of his investigative powers, and barred completely from any management meetings.

Doc. 22, Pl.'s Am. Compl. ¶ 29. As referenced, Defendant offers three arguments to which Plaintiff does not respond as to why that allegation is insufficient to demonstrate notice.

First, Defendant avers that the statement Plaintiff relies on in Paragraph 29 is hearsay. Perhaps. *See Nifong v. SOC, LLC*, — F. Supp. 3d —, 2017 WL 590290, at *3 n.3 (E.D. Va. Feb. 13, 2017) (excluding as hearsay in *qui tam* retaliation action coworker's statement as to employer's notice of plaintiff's protected activity). But the Court need not make that determination at this stage in the proceedings. *See Develder v. Hirschler*, No. 2:09-cv-1803-EFB P, 2016 WL 319219, at *3 (E.D. Cal. Jan. 27, 2016) ("As Rule 12(b)(6) challenges are determined entirely on the pleadings, defendant's attempt to challenge whether plaintiff will be able to overcome a hearsay objection to this evidence in support of his allegations is premature.").

Second, Defendant argues that even if the allegation in Paragraph 29 is not hearsay, then it requires an improper inferential leap because it is based on Klinger's assumption of why Martin told employees to refrain from giving Plaintiff information. Doc. 24, Def.'s Mot. to Dismiss 13. The Court agrees. Plaintiff's Amended Complaint does not allege that Martin or Defendant had notice of Plaintiff's *qui tam* suit; rather, it merely states that "there was every indication that the Qui Tam filing and the information from the meeting with the US Attorney had been leaked out to the Defendant and the management at NTJCC." Doc. 22, Pl.'s Am. Compl. ¶ 29. In other words, and as Defendant notes, Plaintiff assumes that Martin was aware of his protected activity because Martin instructed Klinger not to give information to him. Doc. 24, Def.'s Mot. to Dismiss 13. The Court

takes Plaintiff's claim that Martin told employees to wall Plaintiff off as true, but finds that Plaintiff's assumption does not necessarily follow; there are any number of plausible reasons why Martin might have chosen to do so. As a result, Plaintiff's allegation is insufficient to plausibly demonstrate that Defendant was on notice that litigation was a possibility. *See George*, 864 F. Supp. 2d at 607–08.

Third, Defendant contends that even if Paragraph 29 sufficiently alleges that Martin had notice of Plaintiff's protected activity, Martin is an employee of COI, not Defendant, and therefore her notice cannot plausibly be imputed to Defendant. Doc. 24, Def.'s Mot. to Dismiss 13–14. To start, and as noted above, Plaintiff need not allege some smoking gun instance when Defendant was put on notice of his activities—indirect or constructive notice is sufficient. *See Schuhardt v. Wash. Univ.*, 390 F.3d 563, 568 (8th Cir. 2004) (emphasis added) ("A plaintiff must show the employer had actual *or constructive* knowledge of the protected activity in order to establish a prima facie case of retaliation [under § 3730(h)]."). That said, it's somewhat unclear whether Martin's knowledge or notice can be imputed to Defendant—while she is employed by a separate corporate entity, COI, that entity's operations and personnel are seemingly alloyed with Defendant's. *Compare Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 218 (S.D.N.Y. 2009) (refusing to aggregate the knowledge of separate entities on the basis that they share the same parent company), *with In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 482–83 (S.D.N.Y. 2006) (imputing subsidiary company's scienter to parent company when factual allegations established that parent was familiar with subsidiary's operations and alleged misconduct).

While Defendant urges that such imputation is impermissible as a matter of law, the Court need not take a stance on the matter to render a decision here. Because even assuming that Martin *could* impute her knowledge to Defendant, Plaintiff's First Amended Complaint, taken as true, fails

to show that she plausibly *did*. In short, Plaintiff fails to sufficiently address: (1) the relationship between COI and Defendant; and (2) how as a result of that relationship, Martin's knowledge—assuming she had any—of Plaintiff's engagement in protected activities was passed on to Defendant. *See* Doc. 22, Pl.'s Am. Compl. ¶¶ 29–35.

All in all, Plaintiff's allegations stemming from his role as a relator in a *qui tam* action fail to demonstrate that Defendant was sufficiently on notice that litigation was a possibility. *See George*, 864 F. Supp. 2d at 607–08. Thus, the allegations are insufficient to form the basis of a plausible retaliation claim. *See Guerrero*, 2012 WL 899228, at *7 (internal citations omitted) (explaining that a plaintiff's allegations "must show that the employer was on notice of the distinct possibility of *qui tam* litigation.").

2.    Internal Report

As referenced, to state a plausible FCA retaliation claim, Plaintiff must allege that Defendant was on notice that he was "investigating fraud." *George*, 864 F. Supp. 2d at 607. With that in mind, the Court turns to Defendant's second challenge, namely that Plaintiff's Internal Report was insufficient to put Defendant on notice. Doc. 24, Def.'s Mot. to Dismiss 14–17. Plaintiff does not respond to this point aside from reemphasizing that: (1) under some circumstances, an internal complaint can confer notice; and (2) he filed an internal complaint. *See* Doc. 28, Pl.'s Resp. 21–23.

"Courts have found [the FCA's] notice prong satisfied based on allegations that the employee complained directly to [his] supervisors." *George*, 864 F. Supp. 2d at 608. In considering Defendant's challenge, however, the Court notes that there are two potentially conflicting lines of reasoning at play. On one hand, "'an employee may put her employer on notice of possible False Claims Act litigation by making internal reports that alert the employer to fraudulent or illegal conduct.'"

- 16 -

*Guerrero*, 2012 WL 899228, at *7 (quoting *Lymphatx*, 596 F.3d at 1304). Said differently, "'if an employee wants to impute knowledge to the employer . . . [s]he must specifically tell the employer that [s]he is concerned about possible fraud.'" *George*, 864 F. Supp. 2d at 608 (quoting *United States ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 105 (D. Conn. 2006)). On the other hand, "no 'magic words—such as illegal or unlawful—are necessary to place the employer on notice of protected activity.'" *Id.* (quoting *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 484 (7th Cir. 2004)).

So an internal report must concern possible fraud against the government, but need not necessarily mention fraud. That can be a fine line depending on the substance of the internal report as a whole—if there's not much there, then the lack of "magic words" may well be outcome determinative. *See Robertson*, 32 F.3d at 951 (finding plaintiff's internal report did not constitute protected activity in part because it "never used the terms 'illegal,' 'unlawful,' or '*qui tam* action'"). At bottom, an internal report must still "put the employer on notice that litigation is a reasonable probability." *George*, 864 F. Supp. 2d at 608. "It is insufficient for the relator to show that the employer knew that the whistleblower had concerns about compliance with the law; she must show that the employer was on notice of the distinct possibility of *qui tam* litigation." *United States ex rel. Gonzalez v. Fresenius Med. Care N. Am.*, 748 F. Supp. 2d 95, 104 (W.D. Tex. 2010).

Defendant argues that Plaintiff's Internal Report did not put Defendant on notice that he engaged in activities that could reasonably lead to an FCA case because it just addresses compliance with the Guidelines and never mentions potential fraud against the government. Doc. 24, Def.'s Mot. to Dismiss 15–17. As mentioned above, Plaintiff does not counter Defendant's argument. But his First Amended Complaint does allege that he submitted a written complaint to both COI and Defendant that: (1) set forth violations of the Guidelines that Plaintiff observed; and (2) asserted

- 17 -

that Defendant's amnesty program violated the Guidelines. Doc. 22, Pl.'s Am. Compl. ¶ 30.

The Internal Report was attached to Plaintiff's First Amended Complaint and therefore may be considered by the Court under Rule 12(b)(6) as part of the pleadings. *See King v. Life School*, 809 F. Supp. 2d 572, 578 (N.D. Tex. 2011) ("In the 12(b)(6) context, pleadings include attachments to the complaint."). It alleged, in pertinent part:

> Mrs. Martin (and Mr. Amoran by his failure to end this practice) has established a corrupt system of investigation that violates the PRH, the Concurrent Jurisdiction Agreement between the North Texas Job Corps Center and the McKinney Police Department, state, local, and federal law, including laws designed to protect students' civil rights. Mr. Amoran is aware of Mrs. Martin's malfeasance but seems to be doing nothing to stop it. I once attempted to advise Mrs. Martin of federal and state laws she was violating. Her response to me was: "We are the federal government." This flippant response seems to underscore her disregard for policy and law.

Doc. 22, Pl.'s Ex. 2, Internal Report.

Those are serious allegations. Yet the Court struggles to see how they would put Defendant on notice that *qui tam* litigation was a distinct possibility. *See Gonzalez*, 748 F. Supp. 2d at 104. That's particularly true given the Internal Report's closing paragraph, which expressly states the relief that Plaintiff sought:

> I request respectfully that a neutral investigator be assigned to investigate this matter expediently. I'm also requesting that my original job duties be reinstated immediately, without interference, while these serious allegations are investigated. Thank you.

Doc. 22, Pl.'s Ex. 2, Internal Report.

Nowhere does Plaintiff allege fraud or otherwise mention the possibility of litigation—he just asks for someone to look into his concerns about Martin and Amoran's compliance with the law. To be sure, magic words are unnecessary to put an employer on notice of possible litigation. But Plaintiff's express request for an investigation alone flips that tenet: By saying exactly what he wanted

from his Internal Report (an internal investigation), Plaintiff made it *un*reasonable to expect something more in the form of *qui tam* litigation. Put another way, some words, such as express requests for discrete forms of relief that do not involve litigation, might make it less reasonable for an employer to expect *qui tam* litigation.

Here, Plaintiff's Internal Report complains of his coworkers' and supervisors' noncompliance with the law. Those complaints, coupled with Plaintiff's express request for a single form of relief in the form of an internal investigator, were insufficient to put Defendant "on notice of the distinct possibility of *qui tam* litigation." *Gonzalez*, 748 F. Supp. 2d at 104; *see also George*, 864 F. Supp. 2d at 608 (internal quotation marks and citations omitted) ("Internal reporting has been held to constitute protected activity, but if an employee wants to impute knowledge to the employer for purposes of the second prong of the [FCA retaliation] analysis, he must specifically tell the employer that he is concerned about possible fraud.").

Defendant also asserts a second argument—which, again, Plaintiff does not counter (*see* Doc. 28, Pl.'s Resp. 21–23)—as to why Plaintiff's Internal Report was insufficient to confer notice: It was made in furtherance of his job duties. Doc. 24, Def.'s Mot. to Dismiss 17. Defendant is correct that, generally speaking, internal reports consistent with an employee's job responsibilities are insufficient to put an employer on notice that an employee is engaged in protected activity. *Sealed Appellant I*, 156 F. App'x at 635. That makes sense—how could an employer suspect that an employee was engaged in a protected activity if he or she was conducting investigations that were a part of his or her job? *See id.* Yet Defendant is misguided in arguing that Plaintiff's Internal Report was carried out as part of his job.

"Plaintiff's job was to follow the requirements of [the Guidelines] and to the greatest extent

possible ensure the safety of the students from any type of violence and drug abuse." Doc. 22, Pl.'s Am. Compl. ¶ 15. Those duties might entail some internal reporting, but such internal reports would center on student violence and drug use. The Internal Report in question, by contrast, addressed Plaintiff's coworkers' and supervisors' compliance with the Guidelines or other applicable law. The Court therefore concludes that in filing his Internal Report, Plaintiff "expressed concerns to his supervisors outside of those that were part of his duties." *Sealed Appellant I*, 156 F. App'x at 635.

Nevertheless, and as addressed above, Plaintiff's Internal Report was still insufficient to place Defendant "on notice of the distinct possibility of *qui tam* litigation." *Gonzalez*, 748 F. Supp. 2d at 104. The Court—taking that determination together with Plaintiff's deficient allegations that Defendant was on notice of his role in a *qui tam* action (*see supra* pp. 12–16)—therefore finds that Plaintiff's First Amended Complaint fails to adequately allege that Defendant knew that Plaintiff "had engaged in any activity protected by the FCA—an essential element of an FCA retaliation claim." *United States ex rel. Ligai v. ESCO Tech., Inc.*, 611 F. App'x 219, 220 (5th Cir. 2015) (per curiam). For that reason, the Court concludes that Plaintiff has failed to plead facts sufficient to state a plausible FCA retaliation claim, and accordingly **GRANTS** Defendant's Motion to Dismiss (Doc. 24).

## IV.

## CONCLUSION

The Court notes that "'district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, *unless it is clear that the defects are incurable* or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.'" *In re Am. Airlines, Inc. Privacy Litig.*, 370 F. Supp. 2d 552, 568 (N.D. Tex. 2005) (quoting

- 20 -

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002)) (emphasis added). While Plaintiff has already amended his Complaint once, "this is the first time the [C]ourt has addressed whether [his] pleadings sufficiently state a claim on which relief can be granted." *Id.*

So to ensure that the Court's final decision is based not on the sufficiency of his pleadings but the merit of his claims, the Court **GRANTS** Plaintiff leave to replead. *See id.* at 567–68. Plaintiff may replead his theory that Defendant knew that Plaintiff was involved in a *qui tam* action, but not his theory that the Internal Report put Defendant on notice of the possibility of *qui tam* litigation, which is incurable—the deficiency rests in the Report itself, not Plaintiff's pleadings. Plaintiff's amended pleading should also take into account all other pleading deficiencies identified here and in Defendant's briefing.[10]

For the reasons stated above, the Court **GRANTS** Defendant's Motion to Dismiss Plaintiff's First Amended Complaint (Doc. 24). The Court further **GRANTS** Plaintiff leave to file a second amended Complaint **no later than August 31, 2017**. If Plaintiff fails to amend his Complaint by August 31, 2017, then his claims against Defendant will be **DISMISSED with prejudice**.

---

[10]Defendant's Motion to Dismiss asserts two additional theories as to why Plaintiff's First Amended Complaint is deficient, namely that it is devoid of allegations of: (1) false claims or certifications to the government; and (2) misrepresentations of compliance with statutory, regulatory, or contractual authority. Doc. 24, Def.'s Mot. to Dismiss 18–21. As to the first point, and as Plaintiff notes in his Response, Plaintiff's FCA retaliation claim need not allege false or fraudulent claims to the government. *See Guerrero*, 2012 WL 899228, at \*3; *see also* Doc. 28, Pl.'s Resp. 25. Turning to Defendant's second point, the Court disagrees: Plaintiff's First Amended Complaint plainly alleges statutory, regulatory, and contractual violations. *See* Doc. 22, Pl.'s Am. Compl. ¶ 21. Nonetheless, to the extent that Defendant's arguments on these points go towards the general factual sufficiency of Plaintiff's allegations, Plaintiff should take those challenges into consideration when repleading.

SO ORDERED.

SIGNED: July 28, 2017.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE