# United States District Court
### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| MICHAEL JAMISON | § | |
| | § | |
| | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:16-CV-0441-S |
| | § | |
| | § | |
| FLUOR FEDERAL SOLUTIONS, LLC | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This Order addresses Defendant Fluor Federal Solutions, LLC's ("Defendant") Motion to Dismiss Plaintiff Michael Jamison's ("Plaintiff") Third Amended Complaint [ECF No. 75]. For the reasons stated below, the Motion is granted.

## I.    BACKGROUND

### A.    *Factual Background*

This employment dispute arises out of Plaintiff's allegations that he was retaliated against for engaging in activity protected by the False Claims Act ("FCA"). Pursuant to Special Order 3-318, this case was transferred from the docket of Judge Jane J. Boyle to the docket of this Court on March 8, 2018.

Job Corps is a program created by the Workforce Investment Act of 1998. Third Am. Compl. ¶ 7. Its purpose is to provide educational and vocational technical skills, training, and support services through a nationwide network of campuses, known as Job Corps Centers ("Centers"). *Id.* ¶¶ 7-8. The United States Department of Labor ("DOL") contracted with Career Opportunities, Inc. ("COI"), to operate the North Texas Job Corps Center ("NTJCC"), a Center located in McKinney, Texas. *Id.* ¶¶ 8, 12; *see also* Third Am. Compl. Ex. ("Pl.'s Ex.") 3, at art. 2. On October

1, 2010, Del-Jen, Inc. ("DJI")[1] and COI entered into the Subcontract Agreement regarding the operation of the NTJCC. Third Am. Compl. ¶ 12. According to Plaintiff, by virtue of the Subcontract Agreement, "COI and DJI were operating the NTJCC jointly, with shared duties, and with each company's employees interacting constantly with the other company's employees, and both aware of the operations and events at the [NTJCC]." *Id.*

COI's contract with the DOL allegedly was a performance-based contract with built-in incentive fees, bonuses, and contract extensions determined by comparing the NTJCC's performance with other Centers' performance. *Id.* ¶¶ 8-10. Specifically, the DOL evaluated, rated, and compared each Center in the following categories: (1) total number of students enrolled, (2) students' achievements of academic and vocational credentials, (3) initial job placements, and (4) ongoing job placements following an initial placement. *Id.* ¶ 9. A Center could achieve a more favorable DOL rating by increasing the number of students enrolled and graduated. *Id.* ¶ 10. A more favorable DOL rating resulted in a greater chance of receiving incentive fees, bonuses, and contract extensions. *Id.*

Plaintiff alleges that Center operators are required to follow the requirements of 29 U.S.C. §§ 2881, et seq., 20 C.F.R. Parts 638 and 670, the DOL Job Corps Office Policy and Requirements Handbook ("PRH"), and other DOL guidelines and procedures. *Id.* ¶ 8. According to Plaintiff, these guidelines and policies mandate that Center operators enforce a zero-tolerance policy against students using drugs and other controlled substances, committing acts of violence against other students, or engaging in inappropriate sexual behavior. *Id.* ¶ 11(2).

In August 2012, DJI hired Plaintiff as the Safety, Security, and Transportation Manager for the NTJCC. *Id.* ¶ 17. His position was created as a result of a meeting with the FBI, DOL officials,

---

[1] Fluor Corporation acquired DJI in January 2003. Third Am. Compl. ¶ 12. DJI later merged into Fluor Federal Solutions, LLC, the entity named as the defendant in the instant lawsuit. Def. Fluor Corp.'s Mot. to Dismiss 2 n.1 [ECF No. 11]. As such, Defendant is DJI's successor-in-interest. Resp. 9.

and COI/DJI representatives concerning the City of McKinney Police Department's reported difficulty conducting investigations at the NTJCC. *Id.* As Safety, Security, and Transportation Manager, Plaintiff was to serve as a liaison to the McKinney Police Department. *Id.* Plaintiff also was required to comply with the applicable regulations, guidelines, and procedures and was responsible for ensuring the safety of the students at the NTJCC. *Id.* ¶ 18. In furtherance of his duties, Plaintiff developed a Memorandum of Understanding with the McKinney Police Department that allowed the police to patrol the NTJCC and required Plaintiff to call the police whenever any narcotics were discovered at the NTJCC. *Id.* ¶ 19. In 2010 and 2013, the NTJCC also entered into Concurrent Jurisdiction Agreements with the McKinney Policy Department, pursuant to which the NTJCC agreed to notify the department of any serious offenses or illegal narcotics on the premises. *Id.* ¶¶ 15-16; *see also* Pl.'s Exs. 5, 6.

During Plaintiff's employment, he reported directly to Maria Martin. Third Am. Compl. ¶ 20. Martin's title was Social Development Director, and Plaintiff states that she was "technically" a DJI employee. *Id.* Plaintiff contends that under the Subcontract Agreement, compliance with Security requirements was subcontracted to DJI. *Id.* ¶ 14. "Therefore, even if at some point Martin became a COI employee, at all relevant times the Security responsibilities were those of DJI, and any direction or supervision of [Plaintiff] by Martin was done with the knowledge, acquiescence, and on behalf of DJI." *Id.* According to Plaintiff, COI's principal/owner Lana Kite caused DJI to hire Martin. *Id.* ¶¶ 13-14. Plaintiff alleges that regardless of who her employing entity was, at all times Martin acted as Kite's "alter ego" and answered only to Kite. *Id.* ¶ 14.

Plaintiff alleges that throughout his employment, he witnessed several practices at the NTJCC that violated the applicable guidelines and regulations. For instance, Plaintiff alleges that he opened a locked door in the security department room and observed various contraband, such as marijuana and "white powders." *Id.* ¶ 21. The lead security day supervisor, Jeffrey Joseph, and Martin

allegedly told Plaintiff that the items in the room had been taken from students without any disciplinary action or other consequences. *Id.* According to Plaintiff, DOL regulations mandate the expulsion of students responsible for contraband violations. *Id.* And, the Concurrent Jurisdiction Agreement required that narcotics and other contraband be reported to the McKinney Police Department. *Id.* Plaintiff alleges that Martin told him not to call the McKinney Police Department unless he first received approval from her. *Id.* ¶ 22. Plaintiff protested and "made it clear that he intended to fulfill his job responsibilities." *Id.*

Other violations Plaintiff allegedly witnessed involved various programs and policies implemented by Martin. In late 2013, Martin allegedly began an "amnesty" program, with the stated goal of reducing the number of students terminated from the NTJCC for violations of policy by ten percent. *Id.* ¶ 23. She allegedly told Plaintiff that, pursuant to this program, if any student returning from off-campus voluntarily turned over contraband, then that student would not be expelled, disciplined, or reported to the police. *Id.* Plaintiff states that he "protested that under this program, the DOL would be deceived into believing that violations of law . . . were not occurring, and would thereby be deceived and defrauded." *Id.* Plaintiff also found an "amnesty box" outside the security office, which was a receptacle in which students could voluntarily deposit contraband. *Id.* ¶ 24. "Plaintiff informed Martin that . . . failure to report these incidents fully and truthfully would amount to committing fraud against the Government." *Id.*

Plaintiff also alleges that Martin established an "absolute retention policy," which meant that students would remain enrolled at the NJTCC even if they violated the law or DOL regulations. *Id.* ¶ 25. During the first two months of Plaintiff's employment, he contends that he observed three to ten "incidents" a day. *Id.* ¶ 26. Plaintiff's practice was to contact the McKinney Police Department when he observed these "incidents." *Id.* According to Plaintiff, after he raised concerns about the

amnesty program and refused to follow it, Martin and other managers began retaliating against Plaintiff by (i) harassing him, (ii) repeatedly threatening to terminate his employment if he continued to report incidents of criminal conduct to the police, (iii) instructing the security staff to refrain from notifying Plaintiff of incidents of violence or drug abuse by students, (iv) transferring Plaintiff's investigation responsibilities to the Equal Opportunity Manager, and (v) barring Plaintiff from attending weekly senior management meetings. *Id.* ¶¶ 26-33.

Plaintiff had been collecting information evidencing the ongoing violations at the NTJCC, and he accelerated his gathering of evidence in light of the alleged retaliation. *Id.* ¶ 33. Plaintiff furnished the information he had collected to counsel he retained to prepare and file a lawsuit. *Id.* On November 19, 2013, Plaintiff and three others filed a qui tam action against COI and DJI.[2] *Id.* ¶ 34. Plaintiff believes that Defendant knew the lawsuit was filed because of "the flurry of activity that occurred soon thereafter," including onsite inquiries begun by the DOL, Office of Inspector General, and United States Attorney's Office. *Id.* In early December 2013, an employee of the NTJCC, Fred Klinger, allegedly told Plaintiff that Martin had instructed Klinger not to give any information to Plaintiff concerning occurrences on campus. *Id.* ¶ 36. Klinger also said that Martin and Kite were "very concerned" that Plaintiff had filed or was going to file a lawsuit based on the DOL violations Plaintiff had witnessed. *Id.* That same month, DOL officials made an official visit to the NTJCC. *Id.* ¶ 37.

On January 1, 2014, Plaintiff submitted a written complaint letter (the "Internal Report") to Terri Pinman, a COI employee, and Harold Honie, an employee of Defendant. *Id.* ¶ 38; *see also* Pl.'s Ex. 7. In the Internal Report, Plaintiff alleged that Martin had harassed him for refusing to follow

---

[2] *See United States ex rel. Jamison v. Del-Jen, Inc.,* No. 3:13-cv-04616-L (N.D. Tex. filed Nov. 19, 2013). COI was dismissed without prejudice from the action on September 16, 2016, and Jamison and the other relators filed a separate qui tam action against COI on November 18, 2018. *See United States ex rel. Jamison v. Career Opportunities Inc.,* No. 3:16-cv-03248-S (N.D. Tex. filed Nov. 18, 2016).

directives that violated the PRH and had instructed him not to notify the police when illegal drugs were found or when incidents of violence or other criminal acts occurred at the NTJCC. *Id.* Plaintiff requested that Defendant investigate Martin's conduct. *Id.* According to Plaintiff, neither Pinman nor Honie acted on the Internal Report. Third Am. Compl. ¶ 38. Plaintiff alleges that after he submitted the Internal Report, Martin and Kite continued to exclude him from management meetings, restrict his access to information, and prevent him from contacting the police. *Id.* Plaintiff also alleges that Michael Perez[3] told him that Plaintiff would be fired if he complained to the DOL. *Id.*

Martin and Kite allegedly "engineered further retaliation against Plaintiff" between January 2014 and May 2014. *Id.* ¶ 39. Plaintiff states that Martin told Education Department employees not to call Plaintiff or the Security Department if there were any incidents. *Id.* Plaintiff alleges that serious incidents were hidden from Plaintiff and redirected to managers that reported directly to Martin. *Id.* In May 2014, Plaintiff was suspended. *Id.* ¶ 40. Defendant's Senior Program Director, Beverly Lovett, terminated him on June 20, 2014. *Id.* ¶ 41; *see also* Pl.'s Ex. 8. The stated reason for his termination was that he had engaged in inappropriate conduct, including trying to obtain confidential and HIPAA[4]-protected student information. Pl.'s Ex. 8, at 76.

According to Plaintiff, Martin interviewed employee Jeannie Lane shortly after Plaintiff's termination. Third Am. Compl. ¶ 42. Martin allegedly "interrogated" Lane about conversations between Lane and Plaintiff and specifically asked Lane if Plaintiff had ever discussed filing a lawsuit against DJI/COI for fraud and violations of DOL regulations. *Id.* When Lane said she did

---

[3] Plaintiff refers to Perez as an employee, but it is unclear whether Perez was an employee of COI or DJI. *See* Third Am. Compl. ¶ 27.
[4] Health Insurance Portability and Accountability Act of 1996.

not recall any such conversations, Martin allegedly became upset and "blurted out that she [Martin] 'was sure that Plaintiff had filed a lawsuit.'" *Id.*

Based on the foregoing conduct, Plaintiff alleges a cause of action for retaliatory discharge in violation of section 3730(h) of the FCA. Specifically, Plaintiff contends that Martin "and other members of management" retaliated against him "for threatening to report, or actually reporting, their fraudulent conduct, and for undertaking efforts to stop their violations of law, . . . and for either actually filing, or setting in motion the filing of a *qui tam* action." *Id.* ¶ 50.

### B.    Procedural Background

Plaintiff filed the instant lawsuit on February 17, 2016. After Fluor Corporation moved to dismiss the original complaint, Plaintiff amended the complaint to name the correct defendant, Fluor Federal Solutions, LLC. Defendant moved to dismiss the amended complaint for failure to state a claim. Judge Boyle granted Defendant's motion on July 28, 2017, finding that Jamison failed to adequately allege facts showing that Defendant knew that Plaintiff "had engaged in any activity protected by the FCA—an essential element of an FCA retaliation claim." *Jamison v. Fluor Fed. Sols., LLC*, Civ. A. No. 3:16-CV-0441-B, 2017 WL 3215289, at *11 (N.D. Tex. July 28, 2017) (quoting *United States ex rel. Ligai v. ESCO Techs., Inc.*, 611 F. App'x. 219, 220 (5th Cir. 2015) (per curiam)). Judge Boyle granted Plaintiff leave to replead his theory that Defendant knew that Plaintiff was involved in a qui tam action. *Id.* However, Judge Boyle dismissed with prejudice Plaintiff's theory that the Internal Report put Defendant on notice of the possibility of qui tam litigation. *Id.* Finally, Judge Boyle advised Plaintiff that his amended pleading should "take into account all other pleading deficiencies identified here and in Defendant's briefing." *Id.*

Plaintiff filed a second amended complaint on August 31, 2017. Defendant filed a motion to dismiss. On January 4, 2018, Plaintiff moved for leave to file the Third Amended Complaint.

This Court held a status conference on March 15, 2018, and granted Plaintiff's motion for leave on August 14, 2018. Defendant moved to dismiss the Third Amended Complaint on August 28, 2018. The parties appeared before the Court for oral argument on the pending Motion to Dismiss on December 3, 2018.

## II.    LEGAL STANDARD

To defeat a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008). To meet this "facial plausibility" standard, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility does not require probability, but a plaintiff must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id.* The court must accept well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). However, the court does not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007). A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (internal citations omitted).

The ultimate question is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*,

313 F.3d 305, 312 (5th Cir. 2002). At the motion to dismiss stage, the court does not evaluate the plaintiff's likelihood of success. It only determines whether the plaintiff has stated a claim upon which relief can be granted. *Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977).

## III.    ANALYSIS

The purpose of the FCA is to combat fraud against the government. *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994). To that end, the FCA contains a whistleblower provision that "protects employees who take steps to uncover and report an employer's fraudulent submission of claims to the government." *Guerrero v. Total Renal Care, Inc.*, No. EP-11-CV-449-KC, 2012 WL 899228, at *3 (W.D. Tex. Mar. 12, 2012). An FCA retaliation claim has three elements: (1) the plaintiff engaged in a protected activity; (2) the defendant knew that the plaintiff engaged in the activity; and (3) the defendant discriminated against the plaintiff because the plaintiff engaged in the activity. *United States ex rel. George v. Bos. Sci. Corp.*, 864 F. Supp. 2d 597, 603-04 (S.D. Tex. 2012) (citing *United States ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F. Supp. 2d 487, 510 (S.D. Tex. 2003)).

Plaintiff alleges that he engaged in protected activities falling into two categories: (1) preparing, filing, and participating in qui tam litigation[5] and (2) making "efforts to stop one or more violations of law." Third Am. Compl. ¶ 35. Plaintiff alleges that Defendant was aware that Plaintiff engaged in these activities because Klinger said Martin and Kite were concerned that Plaintiff was filing a lawsuit, the DOL and United States Attorney's Office conducted onsite inquiries, Martin told Lane that Martin was sure Plaintiff had filed a lawsuit, and Plaintiff made complaints directly to Martin. Plaintiff contends that as a result of the relationship between COI and DJI, Martin's, Kite's, and other

---

[5] Plaintiff may have abandoned this theory to some degree, as he now argues that the "gravamen of his complaint" is "that the internal reporting and other actions taken by [Plaintiff] long prior to his termination, *other than* the filing of the *qui tam* lawsuit" were protected activities and that Plaintiff's "*de facto* demotion" constituted an adverse employment action that amounted to retaliation. Resp. 13-14 (emphasis added). However, the Court will address this theory out of an abundance of caution.

employees' knowledge can be imputed to Defendant. Finally, Plaintiff alleges that he was discriminated against as a result of participating in protected activity because, inter alia, he claims he was harassed, threatened, essentially demoted, suspended, and terminated.

### A. *Protected Activity*

Defendant does not challenge whether preparing for, filing, and participating in a qui tam action constitute protected activities, and the Court finds that these actions are protected under the FCA. *See Jamison*, 2017 WL 3215289, at *6 (citing *Robertson*, 32 F.3d at 951). The second category, efforts to stop alleged legal violations, mainly involves allegations that Plaintiff made informal internal complaints.[6] Defendant argues that Plaintiff is precluded from asserting claims based on his internal complaints because Judge Boyle dismissed claims arising out of this alleged protected activity with prejudice. However, this finding related only to the Internal Report, not to the other internal complaints Plaintiff alleges that he made. *Jamison*, 2017 WL 3215289, at *11. Defendant next challenges the internal complaints at the second step of the analysis, arguing that these complaints were insufficient to make Defendant aware that Plaintiff engaged in a protected activity. Defendant also challenges Plaintiff's other alleged effort to stop legal violations, "[r]eporting of drug possession, student violence, and other criminal activity to the [police]," at the second step of the analysis. Third Am. Compl. ¶ 35. Thus, the Court will proceed with its analysis as though the internal complaints and police reports are protected activities and will address Defendant's remaining arguments at the second stage of the FCA retaliation analysis.

---

[6] Specifically, Plaintiff alleges that he protested Martin's instructions not to report criminal activity, criticized the amnesty program, informed Martin that the amnesty program was illegal, and discussed the illegality of the amnesty program with Martin. Third Am. Compl. ¶ 35. In the summary of his protected activities, Plaintiff claims that in paragraphs 31 and 32 of the Third Amended Complaint, he states that he discussed the illegality of the program with Center Director Ominyi Amoran. *Id.* However, this allegation does not appear in the cited paragraphs.

## B. *Employer Awareness*

"A successful [FCA] retaliation claim requires Defendant to have known Plaintiff engaged in a protected activity." *Guerrero*, 2012 WL 899228, at *7 (citing *United States ex rel. Patton v. Shaw Servs., L.L.C.*, 418 F. App'x 366, 371-72 (5th Cir. 2011)). Protected activity is activity that reasonably could lead to an FCA case. *United States ex rel. King v. Solvay S.A.*, No. H-06-2662, 2012 WL 1067228, at *3 (S.D. Tex. Mar. 28, 2012). "It is insufficient for the [plaintiff] to show that the employer knew that the whistleblower had concerns about compliance with the law; []he must show that the employer was on notice of the distinct possibility of qui tam litigation." *Guerrero*, 2012 WL 899228, at *7 (quoting *United States ex rel Gonzalez v. Fresenius Med. Care N. Am.*, 748 F. Supp. 2d 95, 104 (W.D. Tex. 2010)); *see also Robertson*, 32 F.3d at 952 (finding that employer "could not possess the retaliatory intent necessary to establish a violation of the whistleblower provision of the [FCA]" because plaintiff "failed to present sufficient evidence to support a finding that [employer] was aware that [plaintiff's] investigations were in furtherance of a *qui tam* action").

### i. *Defendant's Knowledge of Qui Tam Action*

The first protected activity Plaintiff engaged in is the preparation[7] and filing of the qui tam lawsuit. Although Plaintiff has made substantial changes to his pleadings in an attempt to cure the deficiencies identified in Judge Boyle's prior ruling, the Court finds that the Third Amended Complaint still fails to plead facts sufficient to establish that Defendant had knowledge of Plaintiff's preparation for or participation in the qui tam action at the time it took any of the alleged adverse actions. Judge Boyle concluded that the allegations that (1) Klinger informed Plaintiff that Martin was telling employees not to give information to Plaintiff and (2) information from Plaintiff's meeting with the United States Attorney's Office "must have" been leaked to management were inadequate to

---

[7] Specifically, Plaintiff alleges that he gathered information regarding Defendant's alleged fraud and furnished information to "counsel who were assisting Plaintiff with preparation of [the] lawsuit." Third Am. Compl. ¶ 35.

establish notice. *Jamison*, 2017 WL 3215289, at *8. Plaintiff has altered and/or expanded upon these allegations and has added the allegation regarding Martin's conversation with Lane. However, none of these changes rectify the deficiencies identified by Judge Boyle.

Plaintiff reasserts the Klinger allegation and adds that Klinger allegedly said that "Martin and Kite were very concerned that Plaintiff had filed or was going to file a lawsuit based on the DOL violations Plaintiff had seen at the [NTJCC]." Third Am. Compl. ¶ 36. This added allegation does not cure the defects identified by Judge Boyle. To state a viable FCA retaliation claim, Plaintiff must allege facts sufficient to establish that Defendant was aware that Plaintiff was "either taking action in furtherance of a private qui tam action or assisting in an FCA action brought by the government." *United States ex rel. Ray v. Am. Fuel Cell & Coated Fabrics Co.*, No. 1:09-CV-01016, 2015 WL 874824, at *6 (W.D. Ark. Mar. 2, 2015).

Plaintiff's allegation that Martin and Kite were concerned that Plaintiff either was going to file or had already filed a lawsuit based on violations of the DOL regulations does not satisfy this requirement. "It is insufficient for [a plaintiff] to show that the employer knew that the whistleblower had concerns about compliance with the law; [he] must show that the employer was on notice of the distinct possibility of *qui tam* litigation." *Gonzalez*, 748 F. Supp. 2d at 104; *see also United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 743 (D.C. Cir. 1998) ("Merely grumbling to the employer about . . . regulatory violations does not . . . constitute protected activity."). Based on Plaintiff's allegations, the Court cannot plausibly infer that Martin and Kite were concerned that Plaintiff's unidentified lawsuit was a qui tam lawsuit. And, as to the allegation that Martin told employees not to give information to Plaintiff, Judge Boyle previously noted that there are "any number of plausible reasons" why Martin might have given this instruction. *Jamison*, 2017 WL 3215289, at *8. Plaintiff assumes that Martin and Kite's concern about a potential lawsuit motivated Martin's instruction to Klinger, but he does not provide sufficient factual allegations to

12

support that assumption.

Additionally, the alleged conversation between Martin and Klinger occurred in December 2013. Third Am. Compl. ¶ 36. In the related qui tam litigation, however, Plaintiff alleged that Martin ceased to be employed by DJI in or before November 2013. *See United States ex rel. Jamison v. Del-Jen, Inc.*, 747 F. App'x 216, 220 (5th Cir. 2018). And, Kite was COI's principal/owner, not DJI's. Third Am. Compl. ¶ 13. Thus, even if the Klinger conversation demonstrated that Martin and/or Kite was aware of Plaintiff's participation in a protected activity, Plaintiff would have to establish a basis for imputing that knowledge to Defendant. As discussed below, he has failed do so. *See infra* § III.B.iii.

Plaintiff also claims that Defendant "must have" been alerted to the existence of the qui tam litigation because the DOL, United States Attorney's Office, and Office of Inspector General conducted onsite inquiries at the NTJCC shortly after the filing of the lawsuit. *See* Third Am. Compl. ¶¶ 34, 37. Plaintiff contends that these visits, "accompanied by the ongoing disputes that Plaintiff had been having with Martin and other supervisors . . ., alerted Defendant to the pendency of the [qui tam] lawsuit." *Id.* ¶ 37. The Court finds that these allegations are insufficient to establish that Defendant had constructive knowledge of Plaintiff's participation in the lawsuit. Plaintiff's conclusory allegations require the Court to make an improper inferential leap that Defendant not only knew of the existence of the qui tam litigation based on the DOL's onsite inquiries, but also that it knew that Plaintiff was involved in the litigation. The Court declines to accept Plaintiff's "unwarranted factual inference[]."[8] *Ferrer*, 484 F.3d at 780.

---

[8] To the extent that Plaintiff alleges that Defendant had actual knowledge of the qui tam lawsuit, the Court briefly notes that the action remained under seal until November 20, 2014, five months after Plaintiff was terminated. The FCA mandates that while a qui tam litigation is under seal, relators and the United States Attorney's Office are prohibited from disclosing the existence of a lawsuit or the underlying allegations to anyone other than the relator's counsel and the Government agents assigned to the case. *State Farm Fire & Cas. Co. v. United States ex rel. Rigsby*, 137 S. Ct. 436, 438 (2016).

Finally, Plaintiff now alleges that Martin knew about Plaintiff's participation in the qui tam action because during Martin's interview with Lane, Martin became upset and "blurted out" that Martin "was sure that Plaintiff had filed a lawsuit." Third Am. Compl. ¶ 42. Plaintiff adds that "Martin specifically asked Lane if Plaintiff had ever discussed filing a lawsuit against DJI or COI for fraud and violations of DOL regulations." *Id.* This allegation may be sufficient to establish that Martin had knowledge of the potential of a qui tam lawsuit, as Martin specifically asked about the possibility that Plaintiff had filed a lawsuit for fraud. *See Guerrero*, 2012 WL 899228, at *7 ("[C]ourts decide whether an employer was on notice of possible qui tam litigation by analyzing whether the employee characterized his or her complaints in terms of fraud or illegality."). Even if the Court could plausibly infer from Martin's statement that Martin had knowledge of Plaintiff's qui tam litigation, however, Martin's alleged statement was made after Plaintiff's termination and, thus, after the alleged adverse actions had already taken place. There is no indication that Martin's statement was based upon knowledge and information that Martin obtained prior to Plaintiff's termination.

### ii. *Defendant's Knowledge of Internal Complaints and Police Reports*

The second category of protected activities Plaintiff engaged in is the making of various internal complaints and the reporting of various incidents to the McKinney Police Department. Like the Internal Report, which Judge Boyle found fatally deficient, Plaintiff's "protests" about Martin's instructions not to report criminal activity and "criticism" of the amnesty program concerned Plaintiff's supervisors' purported noncompliance with applicable policies, regulations, and agreements. Third Am. Compl. ¶ 35. But, "[m]erely grumbling to the employer about . . . regulatory violations does not . . . constitute protected activity." *Yesudian*, 153 F.3d at 743; *see also United States ex rel. Portilla v. Riverview Post Acute Care Ctr.*, No. 12-1842 (KSH), 2014 WL 1293882, at *18 (D.N.J. Mar. 31, 2014) (granting motion to dismiss where employer "did not know [plaintiff] was engaging

in protected conduct because she raised nothing more than regulatory concerns" (internal quotation marks omitted)).

Further, Plaintiff's internal complaint regarding Martin's alleged "instructions not to report criminal activity" indicates that he expressed concerns that were part of his duties as Safety, Security, and Transportation Manager. Third Am. Compl. ¶ 35. And, based on Plaintiff's allegations, his conduct was consistent with his responsibilities as Safety, Security, and Transportation Manager. *See, e.g., id.* ¶ 22 ("Plaintiff protested, stating that he had been hired to [ensure] that both state and Federal laws were being followed at the NTJCC, and that applicable DOL regulations would be followed."). Thus, this complaint was insufficient to put Defendant on notice that Plaintiff was engaged in protected activity. *See Sealed Appellant I v. Sealed Appellee I*, 156 F. App'x 630, 635 (5th Cir. 2005) (finding no basis to infer employer knowledge of protected activity where concerns expressed and conduct engaged in by whistleblower were consistent with his job duties).

Similarly, the Court finds that Plaintiff's reports to the McKinney Police Department would not put Defendant on notice that he was engaging in a protected activity. Plaintiff's job duties included "serv[ing] as a liaison to the McKinney Police Department" and "call[ing] the police when any narcotics were discovered at the [NTJCC]." Third Am. Compl. ¶¶ 18-19. Thus, his conduct in calling the police was consistent with his responsibilities as Safety, Security, and Transportation Manager. Nothing in Plaintiff's allegations suggests that his reporting would put Defendant on notice that qui tam litigation was a possibility.

In the Third Amended Complaint, Plaintiff adds that he informed Martin that the NTJCC's non-compliance with the DOL's "zero-tolerance" policy for drugs and violence and failure to report the incidents of student violence and drug abuse "would amount to committing fraud against

the Government." Third Am. Compl. ¶ 24. Plaintiff also alleges that he "advised Martin that the NTJCC was committing fraud on the United States Government by retaining people as students, despite violations of the 'zero tolerance' policy." *Id.* ¶ 31. These complaints likely demonstrate that Martin was on notice of Plaintiff's protected activity. *See Robertson*, 32 F.3d at 951 (noting that successful FCA retaliation cases generally involve "the employee [telling] the employer that she was concerned about the company defrauding the government"). However, these complaints only establish a basis for Martin's knowledge. To successfully plead a retaliation claim, Plaintiff must establish a basis for imputing Martin's knowledge to Defendant. For the reasons set forth below, he has not done so.

### iii.    *Imputing Martin's and/or Kite's Knowledge to Defendant*

Although Plaintiff offers several theories to support the imputation of Martin's and/or Kite's knowledge to Defendant, none are adequate to establish that Defendant was aware of Plaintiff's participation in a protected activity. First, Plaintiff attempts to show the Court that Martin was employed by DJI at the relevant time. Plaintiff repeatedly references paragraph 18 of the Third Amended Complaint, where he allegedly states unequivocally that Martin was an employee of DJI. *See, e.g.*, Resp. 15. However, that statement is nowhere to be found in paragraph 18. The Court assumes that Plaintiff intends to reference paragraph 20, where he states, "Martin at the time was technically an employee of DJI." Third Am. Compl. ¶ 20. The inclusion of the word "technically" is indicative of the vagueness that pervades Plaintiff's allegations. The Court cannot determine when Martin was employed by DJI and when she was employed by COI. This confusion was recognized by the Fifth Circuit in the related qui tam action, in which Plaintiff and his fellow relators alleged that Martin was an employee of DJI at some point between October 2010 and November 2013. *Jamison*, 747 F. App'x at 220. The Fifth Circuit found that there was

"no way of knowing which of Martin's alleged acts could be attributable to [DJI] as opposed to COI." *Id.* The Court finds that the same problem persists in the instant action.

Further, Plaintiff's conclusory suggestion that Martin was an employee of Defendant at the time Martin allegedly obtained knowledge of Plaintiff's qui tam litigation (around November 2013) seems to be contradicted by the Internal Report, which identifies Martin as a COI employee before detailing the alleged retaliation perpetrated by Martin. *See* Pl.'s Ex. 7, at 74 ("Mrs. Martin is employed by the current contractor, [COI]. On October 2013 [sic], I filed a harassment complaint against Mrs. Martin . . . ."). The Internal Report also identifies Martin as "Deputy Director," a job title not included in the list of positions that reported to DJI. *Id.*; *see also* Pl.'s Ex. 3, at 40-41 (listing positions reporting to DJI).

In an attempt to diminish the importance of which entity employed Martin at which time, Plaintiff alleges that that "even if at some point Martin became a COI employee, at all relevant times the Security responsibilities were those of DJI, and any direction or supervision of Plaintiff by Martin was done with the knowledge, acquiescence, and on behalf of DJI." Third Am. Compl. ¶ 14. In the related qui tam litigation, the Fifth Circuit determined that Plaintiff failed to plausibly allege facts from which the Court could impute liability to DJI/Defendant based upon the conduct or knowledge of Martin. *Jamison*, 747 F. App'x at 220 ("The complaint . . . does not permit the reasonable inference that 'a relationship between [Martin and DJI] giving rise to the right of control' existed such that [DJI] could be 'liable for the misconduct alleged.'").

Plaintiff's allegations regarding Kite are similarly deficient. Kite's knowledge can only be imputed to COI, because she was COI's principal/owner. Third Am. Compl. ¶ 13.

"[E]ven assuming that Martin [or Kite] *could* impute her knowledge to Defendant," however, the Third Amended Complaint "fails to show that she plausibly *did*." *Jamison*, 2017 WL 3215289, at

\*8. As before, Plaintiff has not pleaded facts to demonstrate the relationship between COI and Defendant or to demonstrate "how, as a result of that relationship, Martin's [or Kite's] knowledge—assuming she had any—of Plaintiff's engagement in protected activities was passed on to [Defendant]." *Id.*

Plaintiff first attempts to establish the requisite relationship by pointing to the Subcontract Agreement, pursuant to which COI and DJI jointly operated the NTJCC. Jamison alleges that the two entities' employees constantly interacted with one another, were aware of the operations and events at the NTJCC, and "operated as one." Third Am. Compl. ¶ 20. However, the express terms of the Subcontract Agreement provide that DJI is "an independent Subcontractor and not an employee or agent of the Contractor [COI] or DOL, Job Corps." Pl.'s Ex. 3, at art. 7.D. Thus, the express terms of the Subcontract Agreement confirm that COI and DJI operated as separate corporate entities and provide no basis upon which to impute the knowledge of a COI employee to Defendant.

Plaintiff appears to imply that, notwithstanding the language in the Subcontract Agreement, COI was the alter ego of DJI. To establish alter ego status, Plaintiff must show that DJI exercised such control over "the internal business operations and affairs" of COI that the corporate separateness of the two entities can be disregarded. *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983). Courts in the Fifth Circuit consider twelve factors in conducting this analysis. *See Gundle Lining Constr. Corp. v. Adams Cty. Asphalt, Inc.*, 85 F.3d 201, 208-09 (5th Cir. 1996). Plaintiff has not addressed any of the factors directly. Instead, Plaintiff simply alleges that COI and DJI "were working together and directing each other's employees" and "operated as one." Third Am. Compl. ¶ 20. Plaintiff expresses his frustration at being "repeatedly confronted with claims that the actions complained of were those of another corporation" and argues that there

was no bright line distinguishing employees of one entity from those of the other. Resp. 8 n.8. Nonetheless, Plaintiff's unadorned allegations are insufficient to overcome the presumption of corporate separateness. *See Jamison*, 747 F. App'x at 220 (finding allegation that "COI was nothing but a fraudulent shell front company" to be insufficient to plead attributed liability theory). Without a basis for attributed liability, Plaintiff's allegations do not support the reasonable inference that DJI/Defendant had the requisite notice of Plaintiff's protected activity.

In his Response, Plaintiff argues that Defendant can be liable for COI's wrongdoing through application of the "right of control" rule. *See Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985). Under this rule, "[o]ne who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 414 (1977)). The Third Amended Complaint contains several allegations that COI exercised control over DJI's performance under the Subcontract Agreement and exercised control over DJI's employment of Plaintiff, which forms the basis of Plaintiff's alleged injury. *See* Third Am. Compl. ¶¶ 6, 12-14, 17-18, 20, 22, 24-25, 39. Therefore, Plaintiff contends that he has sufficiently alleged that COI's knowledge can be imputed to Defendant through application of the "right of control" rule.

Even assuming Plaintiff has alleged facts sufficient to support the conclusion that COI exercised control over DJI with respect to Plaintiff's employment, the "right of control" test only imputes liability for the acts of an independent contractor to the general contractor. Thus, if the test applied in this case, it could result only in holding the general contractor, COI, liable for the alleged wrongful acts of its independent contractor, DJI. *See Redinger*, 689 S.W.2d at 418.

Plaintiff has not cited to any authority to support his theory that DJI, as subcontractor, could be liable for the acts of COI, the general contractor.

For the foregoing reasons, the Court finds that Plaintiff has not pleaded sufficient facts from which this Court could impute Martin's or Kite's alleged knowledge of Plaintiff's protected activity to Defendant.

## C. *Adverse Acts and Causation*

Defendant also attacks the final element of Plaintiff's FCA retaliation claim, contending that it did not discriminate against Plaintiff as a result of his participation in a protected activity. First, Defendant argues that Plaintiff has alleged no facts causally connecting any alleged protected activity to his termination. The Court agrees, as Plaintiff does not allege that either Martin or Kite was involved in Plaintiff's termination or that that the person who made the decision, Lovett, was aware of Plaintiff's protected activity. However, Plaintiff alleges myriad adverse actions in addition to his termination.

Plaintiff contends that Martin, and possibly others, retaliated against him by: (i) harassing Plaintiff for his complaints about the amnesty program, (ii) threatening to terminate his employment if he continued to report incidents of criminal conduct to the police, (iii) instructing the security staff to no longer notify Plaintiff of incidents of violence or drug use or providing Plaintiff with information regarding any concerns they may have about criminal conduct by students, (iv) transferring Plaintiff's investigation responsibilities to the Equal Opportunity Manager, and (v) barring Plaintiff from attending weekly senior management meetings. Third Am. Compl. ¶¶ 26-33, 39. Each of these alleged adverse actions occurred before Plaintiff filed his qui tam lawsuit, so there can be no causal connection between that protected activity and any of the adverse actions. *See Jamison*, 2017 WL 3215289, at *7 (noting that "as a temporal matter" any of Plaintiff's allegations regarding alleged "roadblocks" put in

Plaintiff's way to impede him from doing his job occurred before the filing of his qui tam litigation and, therefore, did not plausibly demonstrate that Defendant had notice of his qui tam action).

Plaintiff alleges two actions, his suspension and alleged blackballing, that took place after the lawsuit was filed. *See* Third Am. Compl. ¶ 44. It is unclear who allegedly blackballed Plaintiff, and it appears that COI caused Plaintiff's suspension. *See* Pl.'s Ex. 8 ("As you are aware you were placed on paid leave of absence pending investigation after COI raised concerns about your performance and conduct at the Center."). As discussed above, the retaliator's identity is significant because Plaintiff has failed to plead sufficient facts from which this Court could impute liability for actions taken by COI to DJI/Defendant.

This pleading defect is also fatal to Plaintiff's contention that the other adverse actions occurred as a result of Plaintiff's second protected activity, the internal complaints. The harassment, threats, and "*de facto*" demotion were allegedly perpetrated by Martin and, perhaps, other COI employees. Resp. 13. Plaintiff has failed to plead with sufficient particularity any specific adverse employment actions, other than his termination, taken against him by an agent, manager, or supervisor of Defendant. In addition, as discussed above, this Court has already determined that Plaintiff has failed to plausibly plead that DJI/Defendant had knowledge of Plaintiff's internal complaints or that Defendant was otherwise put on notice that Plaintiff was engaging in protected activities that reasonably could have led to an FCA investigation or claim.

### D. *Amendment*

Whether to allow a party to amend its complaint "is left to the sound discretion of the district court." *Udeigwe v. Tex. Tech Univ.*, 733 F. App'x 788, 794 (5th Cir. 2018) (quoting *United States. ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 387 (5th Cir. 2003)). In determining whether to allow an amendment of the pleadings, a court considers the following: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments

previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). A court is justified in denying leave to amend when a plaintiff "fails to cure deficiencies by amendments previously allowed." *Willard*, 336 F.3d at 386 (quoting *Foman*, 371 U.S. at 182).

Over the past two years, Plaintiff has had several opportunities to amend his complaint to plead sufficient facts to state a claim of retaliation under the FCA. Plaintiff has had the benefit of Defendant's prior motions to dismiss and Judge Boyle's prior ruling to alert him to the problems with his pleadings. Nevertheless, he has failed to cure these deficiencies or otherwise plead sufficient facts to support his claim of retaliation under the FCA. The Court presumes that Plaintiff has pleaded his best case at this point and, therefore, will not allow him another opportunity to amend his complaint.

## IV.    CONCLUSION

For the foregoing reasons, the Court grants Defendant's Motion to Dismiss and dismisses this action with prejudice.

**SO ORDERED.**

SIGNED February _6_, 2019.

**KAREN GREN SCHOLER**
**UNITED STATES DISTRICT JUDGE**